SO ORDERED.

SIGNED this 27th day of October, 2014.



_____
Janice Miller Karlin
United States Bankruptcy Judge

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:                                          Case No.  14-40529
**William Leroy McDonald**                       Chapter 13
**Bonnie Kaye McDonald,**

                    **Debtors.**
_____

In re:                                          Case No.  14-40543
**Kliffton Joseph Scott**                        Chapter 13
**Jeanette Lynn Scott,**

                    **Debtors.**
_____

### Memorandum Opinion and Order Sustaining Trustee's Objections to
### Confirmation of Chapter 13 Plan and Objections to Exemption

Debtors, William and Bonnie McDonald and Kliffton and Jeanette Scott, have

filed chapter 13 plans that do not propose to pay any amount to satisfy the best interest

of the creditors test of 11 U.S.C. § 1325(a)(4) with regard to per capita payments they

receive from the Prairie Band Potawatomi Nation Indian Tribe (hereinafter "Prairie

Band" or the "Tribe"). Building on governing precedent, the Court concludes that despite

changes to the Prairie Band Per Capita Ordinance and Tribal Code since it last ruled on these issues, the per capita payments remain property of the respective chapter 13 estates, and the Debtors' plans have thus failed to satisfy the best interest of the creditors test with respect to this contingent, unliquidated property.

Debtors William and Bonnie McDonald also seek to exempt the per capita payments from the bankruptcy estate by arguing they are exempt under 11 U.S.C. § 522(b)(3)(A) as "local law that is applicable . . . at the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition." The McDonalds have stipulated that their domicile is in Topeka, Kansas, however, and they are not domiciled on Prairie Band land. As a result, § 522(b)(3)(A)'s exemption based on "local law" is not applicable. The McDonalds' other exemption arguments likewise fail.

As a result of the conclusions discussed more fully herein, the Court sustains the Chapter 13 Trustee's objections to confirmation and objections to exemption in each case.

## I.     Background and Procedural Facts

Both sets of Debtors filed joint bankruptcy petitions under chapter 13 of the Bankruptcy Code.[1] The Trustee objected to confirmation of plans filed in each case because neither plan satisfied the best interest of the creditors test as to Debtors' per

---

[1] All future statutory references are to title 11 (the "Bankruptcy Code"), unless otherwise specified herein.

capita payments.[2] The Trustee also objected in each case to the Debtors' claimed exemption of the per capita payments. In their joint stipulation and briefing, the Scott Debtors abandoned their exemption claim, so only the McDonald Debtors still claim the per capita payments as exempt.

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following findings of fact are based upon the stipulations filed by the parties, including stipulated exhibits.[3]

### A.    William and Bonnie McDonald

The McDonald Debtors filed their chapter 13 bankruptcy petition on May 14, 2014. Debtors are married and have below median income for their household size and geographical region under § 1325(b)(3) and (4). Debtor Bonnie McDonald is a member of the Tribe. As a member, Bonnie receives quarterly "per capita" gaming revenue distributions in accordance with the Prairie Band Per Capita Ordinance. The McDonald

---

[2]  The McDonald Debtors make a fleeting one-sentence argument that because their case has "not been consolidated for the purpose of administration," only Bonnie McDonald, and not also William McDonald, should be affected by the Trustee's motion to dismiss and objection to confirmation. But the McDonald Debtors have filed a joint petition and plan, and have never moved to sever their jointly administered bankruptcy case. As such, the Court will not further address this possible 'argument." If the McDonald Debtors wish to sever their joint bankruptcy case, they may file the proper motion to do so, which would be considered in due course after opportunity for objection and argument.

[3]  The parties filed a Joint Stipulation of Facts, and attached Title 4 of the "Potawatomi Law and Order Code" as Exhibit A, Doc. 33 in the McDonald Case No. 14-40529 and Doc. 40 in the Scott Case No. 14-40543. The parties also filed a supplement to that Stipulation with the Tribe's "Per Capita Ordinance" attached as Exhibit B, Doc. 40 in the McDonald Case No. 14-40529 and Doc. 41 in the Scott Case No. 14-40543. Hereinafter, these will be referred to as the "Tribal Code" (cited as Exhibit A) and the "Per Capita Ordinance" (cited as Exhibit B), respectively.

-3-

Debtors claim an exemption in Bonnie's per capita payments.

When Debtors filed their bankruptcy petition, they lived at an address in Topeka, Kansas where they had resided for at least 730 days prior to filing. This residence is not located on the Tribe's reservation. In addition, Bonnie holds a non-transferable joint tenancy interest in approximately 86 acres of Tribal trust agricultural land managed by the Secretary of the Interior pursuant to 25 U.S.C. § 3701–3715. Bonnie values that interest at zero.

Debtors' Schedule I estimates Bonnie's per capita payment at $361/mo. This income is also listed on Debtors' Form 22C. Debtors' only other income is from Bonnie's receipt of Social Security disability payments. Debtors' plan provides for monthly payments of $130, paying attorney fees, a secured debt to the Shawnee County Treasurer for real estate taxes, the filing fee, Trustee fees, and approximately $495 to unsecured creditors. The plan is a 36 month base case, makes no specific reference to per capita payments, and states the amount payable under paragraph 15's "Best Interests of Creditors Test" is zero.

### B.     Kliffton and Jeanette Scott

The Scott Debtors filed their chapter 13 bankruptcy petition filed on May 15, 2014. Debtors are married and have below median income for their household size and geographical region under § 1325(b)(3) and (4). Debtor Jeanette Scott is a member of the Tribe. As a member, Jeanette receives quarterly per capita gaming revenue distributions in accordance with the Prairie Band Per Capita Ordinance. The Scott Debtors originally claimed an exemption in Jeanette's per capita payments but have

-4-

now abandoned that exemption. Debtors had no per capita funds on hand when they filed their bankruptcy petition.

When Debtors filed their bankruptcy petition, they lived in Topeka, Kansas, and had lived in either Topeka or nearby Carbondale for at least 730 days prior to filing. Neither the Topeka nor Carbondale residence is located on the Tribe's reservation. Debtors' Schedule I estimates Jeanette's per capita payment at $472.80/mo.[4] This income is also listed on Debtors' Form 22C. Debtors' plan provides for monthly payments of $270, and proposes to pay the filing fee, attorney fees, a priority tax debt, and a special class claim for unpaid rent. The plan proposes no distribution to unsecured creditors and makes no specific reference to per capita payments. The plan provides a zero amount under paragraph 15's "Best Interests of Creditors Test."

## II.    Analysis

### A.    Relevant Case Law From This District

This Court first addressed the issue of per capita payments from the Prairie Band Tribe in *In re McDonald*.[5] In *In re McDonald*, the debtors did not deny that the per

---

[4]  Since both Debtors receive the same amount per quarter from the Tribe, the Court cannot explain why the McDonalds' and Scotts' estimates of how the quarterly benefits translate into monthly amounts differ so substantially on their respective Schedules I ($361 versus $472).

[5]  353 B.R. 287 (Bankr. D. Kan. 2006) (Karlin, J.). Coincidentally, the debtors in *McDonald* are the same individuals as the McDonald Debtors herein. Although the Stipulation of Facts does not reveal how long this Tribe has been making quarterly per capita distributions, the fact that Bonnie McDonald has apparently been receiving them since at least 2005 (the year her Chapter 13 case was converted to Chapter 7 in the prior *McDonald* decision, *id.* at 289) gives some credence to the argument that they may continue into the years during which these Debtors' plans will remain pending. The *McDonald* decision reveals the payments ranged around $800 per quarter in 2005 and 2006. *Id.*

-5-

capita payments were property of the estate, and instead argued that the per capita payments were exempt.[6] Before addressing the debtors' exemption argument, the Court first relied on two prior decisions from other jurisdictions, *In re Kedrowski*[7] and *Johnson v. Cottonport Bank*,[8] to affirmatively hold that the per capita distributions were property of the estate.[9]

In their prior case, Debtors claimed the per capita payments were exempt under the then-active Potawatomi tribal code provision providing that "per capita distributions 'shall be exempt, from garnishment, attachment, execution, sale, and other process for the payment of principal and interest, costs, and attorney fees upon any judgment of the Tribal Court.'"[10] The Court held that debtors were not "entitled to rely upon the exemptions contained in the Potawatomi Tribal Code,"[11] reasoning that because Kansas is an opt-out state, debtors were limited to the exemptions allowed under Kansas law.[12] Because Kansas law did not permit exemption based on the Potawatomi tribal code, debtors could not thus rely.[13]

---

[6]  *Id.* at 290–91.

[7]  284 B.R. 439, 446 (Bankr. W.D. Wis. 2002).

[8]  259 B.R. 125, 131 (W.D. La. 2000).

[9]  *In re McDonald*, 353 B.R. at 291.

[10]  *Id.* at 292 (quoting then-current tribal code) (internal emphasis omitted).

[11]  *Id.*

[12]  *Id.*

[13]  This Court also noted that Kansas law permits debtors to claim the exemptions contained in § 522(d)(10), which includes payments for social security benefits and

-6-

The debtors in *In re McDonald* next argued that the per capita payments were excluded from the property of the estate by § 541(c)(2), as trust funds protected by a spendthrift provision.[14] The Court again ruled against the debtors, holding that the postpetition per capita payments were not held in trust because the Tribe's per capita ordinance placed no restrictions on the per capita payments to be made to competent, adult members of the Tribe.[15] Regarding the debtors' argument that the tribal code exemption somehow created a trust, the Court stated:

> Although the Tribe, through the Ordinance, clearly indicates that the per capita distributions are not subject to garnishment, attachment, execution, sale or other process under tribal law, it just as clearly does not impose a trust upon all of the per capita distributions. If the Court were to follow Debtors' argument in this case—that because the property is exempt, it is by definition also trust property, every piece of real or personal property that is exempt under state or federal law would have to likewise be considered trust property and excluded from the bankruptcy estate pursuant to § 541(c)(2), including wages, homesteads, automobiles, tools of the trade, etc. Property is not subject to a trust simply because a governmental entity has declared that property exempt from execution to satisfy a judgment.[16]

The Court did find that the Tribe had expressly created a trust for per capita payments to "incompetents and minors," but that no other trust was created by the per capita distributions which, per tribal code and ordinance, were to be made to all members,

---

disability payments, reasoning that the legislature obviously knew how to enumerate specific exemptions when it chose to do so. *Id.* at 292 n.8.

[14] *Id.* at 293.

[15] *Id.* at 294.

[16] *Id.*

-7-

regardless of need or individual circumstances.[17]

In a decision issued the same day as *In re McDonald*, in the case of *In re Hutchinson*,[18] the Court also addressed whether the per capita payments were exempt as "a local public assistance benefit" under § 522(d)(10)(A).[19] The Court adopted the following definition of "public assistance benefit:" "government aid to needy, blind, aged, or disabled persons and to dependent children."[20] Because the Tribe's per capita payments were not based on need, but were distributed simply on a per capita basis (specifically, "in equal amounts to all enrolled tribal members regardless of need"), the Court concluded they were not an exempt public assistance benefit.[21]

The *In re Hutchinson* case then addressed the § 1325(a)(4) best interest of the creditors test. First, the Court clarified that the best interest of the creditors test of § 1325(a)(4) is a separate and distinct test from the "best effort" requirement of § 1325(b)(1). As such, the fact that the debtors were proposing to commit all of their disposable income to plan payments during the life of their chapter 13 plan had no bearing on the § 1325(a)(4) analysis.[22] Second, the Court rejected the argument that the per capita payments could not be valued because of their uncertain nature. The Court

---

[17]  *Id.* at 294–95.

[18]  354 B.R. 523 (Bankr. D. Kan. 2006) (Karlin, J.).

[19]  *Id.* at 529.

[20]  *Id.* at 530.

[21]  *Id.* at 530–31.

[22]  *Id.* at 531.

Case 14-40529    Doc# 48    Filed 10/27/14    Page 8 of 30

concluded that the fact that "the present value of the per capita distributions might be difficult to ascertain does not mean that those distributions have no value."[23] Because the per capita payments were capable of being valued, the payments "must be provided for in [the debtors'] Chapter 13 plan in the form of payments to the unsecured creditors to satisfy the 'best interest of the creditors test.'"[24]

Four years later, in *In re Howley*,[25] another judge from this District, Judge Somers, addressed the same Prairie Band Tribe per capita payments. In *In re Howley*, the debtors again attempted to exempt their Tribe per capita payments under the tribal code, which was worded the same as it had been at the time both *In re McDonald* and *In re Hutchinson* were decided.[26] The Court, relying on *In re McDonald,* held that because the debtors were domiciled in Kansas, they could only use Kansas' state law exemptions and were not entitled to use the exemptions of the tribal code.[27] Judge Somers also addressed the additional argument that the Tribe's exemption was a "local law" within the meaning of § 522(b)(3)(A)'s provision of an exemption for property

---

[23] *Id.* at 532.

[24] *Id.*

[25] 439 B.R. 535 (Bankr. D. Kan. 2010) (Somers, J.).

[26] *Id.* at 538.

[27] *Id.* at 539 ("Thus, the Kansas legislature, as authorized by Congress in § 522(b)(2), has provided that the exemptions of § 522(b)(1) are not available, and that the 'exemptions allowed under state law' and § 522(d)(10) are available. Although it could clearly do so, the Kansas legislature has not incorporated the tribal exemptions into state law.").

-9-

exempt under "State or local law."[28] Judge Somers concluded that, even if the Tribe's exemption could be considered a local law, the Tribe's exemption could not apply because § 522(b)(3)(A) "expressly requires use of state or local law applicable at the place in which the debtor's domicile has been located for a specific period."[29] Because the debtors in *In re Howley* did not live on the Tribe's reservation, the Tribe's exemption did not apply because it had no extraterritorial effect.[30]

## B.    The Current Relevant Tribal Authority

The Indian Gaming Regulatory Act of 1988 generally governs the practice of casino gambling on tribal lands.[31] Pursuant to this Act, the Tribe has adopted a Per Capita Ordinance. Some version of that Ordinance was approved by the Secretary of the Interior on August 25, 2008.[32] The Per Capita Ordinance directs that "every eligible Potawatomi tribal member" receive an "equal share" of the Tribe's net gaming

---

[28]  *Id.* at 540–42.

[29]  *Id.* at 541–42.

[30]  *Id.* at 542. In dicta, Judge Somers also noted that the exemption as worded also applied only to judgments of the tribal court, and that, therefore, the limited scope of the exemption simply did not apply. *Id.* at 542–43. This language has been changed in the current version of the Tribal Code, but that change is not relevant herein.
In a follow-up opinion, *In re Howley*, 446 B.R. 506 (Bankr. D. Kan. 2011), Judge Somers addressed the debtor's late argument that the per capita payments were not, in fact, property of the estate. Judge Somers affirmatively found that the Prairie Band per capita payments were contingent interests that were property of the estate, and rejected the argument that the contingent nature removed future per capita payments from the Chapter 7 trustee's reach. *Id.* at 513–14.

[31]  25 U.S.C. §§ 2701–2721.

[32]  Exhibit B p.7. Again, the earlier *McDonald* case demonstrates that the same or a similar per capita program by this Tribe was in existence at least by 2005. 353 B.R. at 289.

-10-

revenues.[33] The Per Capita Ordinance also states: "Every living person who is an enrolled member of the Prairie Band of Potawatomi Indians on the eligibility determination date is eligible to receive a Per Capita Payment."[34] The distribution is solely "based on the latest membership list as of the eligibility determination date."[35] The per capita payments are to be disbursed within certain time periods, and are to be made by "tribal check . . . payable to the eligible tribal member."[36] Each per capita payment must be accompanied by a notice that federal law requires that the per capita payments be subject to federal taxation and that the Tribe will withhold federal income tax from each per capita payment.[37] Both minors and legally incompetent tribal members are the only individuals whose payments are treated differently.[38]

The Tribe has also enacted a "Law and Order Code" (the "Tribal Code"), with section 4-14-1 of the Tribe's Civil Procedure Code dealing specifically with "claims against per capita."[39] Several terms are specifically defined within this section of the Tribal Code. The term "per capita" means "the payment provided to all enrolled members of the Prairie Band . . . which are paid directly from the Prairie Band . . . Net

---

[33] Exhibit B p.5 (Article V, Section 1).

[34] Exhibit B p.4 (Article IV, Section 1).

[35] Exhibit B p.4 (Article IV, Section 2).

[36] Exhibit B p.5 (Article V, Sections 2 and 3).

[37] Exhibit B p.6 (Article V, Section 7).

[38] Exhibit B p.5–6 (Article V, Sections 4 and 5).

[39] Exhibit A p.4-41 to 4-44.

Gaming Revenues pursuant to the . . . Per Capita Ordinance."[40]

This section of the Tribal Code also defines the term per capita *share* as "a Tribal member's equal share of a Per Capita payment prior to a reduction for any withholding, garnishment, or levy permitted by this Section, but after withholding at the source required by federal income tax law."[41] The term per capita *payment* is then defined as "a personal benefit to a Tribal member," and "a periodic payment not a property right."[42] The same section also states that a per capita *share* "is property of the [Tribe] until such time as a distribution is duly made."[43] The Tribal Code then states that a "distribution of a Per Capita payment occurs when the Per Capita payments are placed in the U.S. Mail or otherwise transferred to a Tribal member."[44]

Two additional sections of the Tribal Code are pertinent. In a section titled "Permitted Claims against a Per Capita Share," the Tribal Code states: "A Per Capita Share shall not be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, seizure, attachment or other legal or equitable process."[45] Three exceptions to this general rule are then listed: for debts owed by tribal members to the

_____

[40]  Exhibit A p.4-42 (Section (D)(4)).

[41]  Exhibit A p.4-42 (Section (D)(6)).

[42]  Exhibit A p.4-43 (Section (E)).

[43]  *Id.*

[44]  Exhibit A p.4-43 (Section (F)).

[45]  Exhibit A p.4-43 (Section (G)(1)).

Tribe, for garnishments for child support, and for federal income tax levies.[46] And finally, in a section titled "Prohibited Claims," the Tribal Code states again: "a Per Capita Share shall not be subject to anticipation, alienation, sale, transfer, assignment[,] pledge, encumbrance or charge, seizure, attachment or other legal or equitable process; and any proceeding for those purposes shall not be recognized nor enforceable."[47] The same exceptions for debts owed to the Tribe, child support, and federal tax levies apply to this section as well.

The major changes to the Tribal Code and Per Capita Ordinance are three-fold. First, the Tribal Code distinguishes between per capita shares and per capita payments, and includes an anti-alienation provision for per capita shares. Second is the addition of the language stating that a per capita payment "is a personal benefit" and "a periodic payment not a property right," while a per capita share "is property of the [Tribe] until such time as a distribution is duly made." Finally, the Per Capita Ordinance no longer has a section on exemption, but instead the language of the Tribal Code includes the anti-alienation language previously noted.[48]

---

[46]  Exhibit A p.4-43 (Section (G)(1)–(3)).

[47]  Exhibit A p.4-44 (Section (H)).

[48]  The Trustee mentions in his brief that the per capita provisions of the Tribal Code have not been approved by the Secretary of Interior, as Per Capita Ordinances must be. Case No. 14-40529, Doc. 41 at pp.22–23; *see also* 25 U.S.C. § 2710(b)(3)(B) (requiring approval by the Secretary of the Interior of gaming ordinances for per capita payments to members of an Indian tribe). The Trustee states that the Tribe has "attempted to modify the Tribal members' interest in per capita payments [through the Tribal Code] without amending the Per Capita Ordinance and without obtaining approval of the Secretary of the Interior." Case No. 14-40529, Doc. 41 at p.23. The Trustee has not squarely presented this argument, however, or cited any authority for this Court to address a claim against the validity of the Prairie Band's Tribal Code. Accordingly, the Court will not address it further.

-13-

### C.   Analysis of the Arguments of the Parties

#### 1.   Property of the Estate

The Bankruptcy Code defines property of the estate in § 541. Under § 541(a), property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," except for property that is excluded from the estate by § 541(b) and § 541(c)(2).[49] While no party has argued that § 541(b) has any applicability to this case, both the McDonalds and the Scotts rely on § 541(c)(2)—which excludes from the bankruptcy estate "a debtor's beneficial interest in a spendthrift trust"[50]— to support their argument that the per capita payments are not property of their respective bankruptcy estates.

To determine whether a debtor's interest in a trust is excluded from the bankruptcy estate, the Court must "analyze the nature of that interest, under applicable state law."[51] Under Kansas law, a "spendthrift trust is a trust created to provide a fund for the maintenance of a beneficiary and at the same time to secure the fund against his improvidence or incapacity. Provisions against alienation of the trust fund by the

---

[49] Section 1306 expands the definition of property of the estate in chapter 13 cases to also include property rights a debtor "acquires after the commencement of the case but before the case is closed, dismissed, or converted."

[50] *Case v. Hilgers (In re Hilgers)*, 371 B.R. 465, 468 (10th Cir. BAP 2007). Section 541(c)(2) excludes from the bankruptcy estate property upon which there is a "restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law" by providing that the restrictive provision "is enforceable in a case under this title." *Id.*

[51] *Id.* at 468.

-14-

voluntary act of the beneficiary or by his creditors are its usual incidents."[52]

To exclude property from the bankruptcy estate under § 541(c)(2), Debtors must satisfy three criteria. "First, they must show that they have a beneficial interest in a trust. Second, they must show that there is a restriction on the transfer of that interest. Third, they must show that the restriction is enforceable under nonbankruptcy law."[53] Debtors bear the burden of proof regarding whether property can be excluded from the bankruptcy estate.[54]

As discussed above, this Court in *In re McDonald* previously considered the issue of whether Prairie Band per capita payments could be excluded from property of the estate by § 541(c)(2) as trust funds protected by a spendthrift provision. Because there were no restrictions made on the per capita payments actually made to competent adult members of the Tribe, and because the property's Tribal exempt status did not transform it into a trust, however, there was no spendthrift trust found.[55] The *In re McDonald* opinion also noted that the Tribe obviously knew how to create a trust via per capita payments, because trust provisions were included for both minors and

---

[52] *In re Estate of Sowers*, 1 Kan. App. 2d 675, 680, 574 P.2d 224, 228 (1977).

[53] *In re McDonald*, 353 B.R. at 293.

[54] *See Rhiel v. Adams (In re Adams)*, 302 B.R. 535, 540 (6th Cir. BAP 2003) ("Debtors bear the burden of demonstrating that all the requirements of § 541(c)(2) have been met before the property in question can be effectively excluded from the estate."); *In re Robben*, 502 B.R. 572, 577 (Bankr. D. Kan. 2013) (relying on *Adams* to conclude the same); *In re McDonald*, 353 B.R. at 293 (same).

[55] *In re McDonald*, 353 B.R. at 294.

incompetent persons.[56]

The same remains true today, regardless of the changed state of the Prairie Band's Per Capita Ordinance and Tribal Code. The current Prairie Band Per Capita Ordinance directs that "every eligible Potawatomi tribal member" receive an "equal share" of the Tribe's net gaming revenues.[57] The distribution is not based on need, disability, or any other qualifier, but is instead solely "based on the latest membership list as of the eligibility determination date."[58] The Tribal Code elects to only treat per capita payments for minors and legally incompetent tribal members differently.[59]

The Tribal Code dictates that the "per capita" is "the payment provided to all enrolled members of the Prairie Band . . . which are paid directly from the Prairie Band" from the Tribe's net gaming revenues.[60] So again, no restrictions or discretion is present to transform the per capita into a trust. There is simply no trust created by the Per

---

[56]  *Id.* at 294–95.

[57]  Exhibit B p.5 (Article V, Section 1). The Per Capita Ordinance also states: "Every living person who is an enrolled member of the Prairie Band of Potawatomi Indians on the eligibility determination date is eligible to receive a Per Capita Payment." Exhibit B p.4 (Article IV, Section 1).

[58]  Exhibit B p.4 (Article IV, Section 2).

[59]  Exhibit B p.5–6 (Article V, Sections 4 and 5). The Per Capita Ordinance establishes the following general terms for the trust for minors: the trust is irrevocable and administered by an independent trustee, all per capita payments, plus interest, are held in a trust account until the child reaches 18, and then the accrued per capita distributions, with interest, are paid out at established percentages over the next 3 years. There is an exception, as is common for many trusts for minors, allowing the trustee to make distributions for the minor's health, education or welfare upon the request of a parent or legal guardian if deemed necessary by the independent trustee. Exhibit B p.5–6 (Article V, Section 5).

[60]  Exhibit A p.4-42 (Section (D)(4)).

Capita Ordinance or Tribal Code; i.e., there is no "beneficial interest in a trust,"[61] which is a required element to find a spendthrift trust.

Debtors argue that other changes in the Per Capita Ordinance and Tribal Code change this conclusion. The current Tribal Code—in the changes spawning this litigation—distinguishes between a per capita *share*, which is the Tribal member's share of the per capita prior to distribution,[62] and a per capita *payment*, which is the per capita distribution made when the Tribe mails the per capita payment to each Tribal member.[63] The cited language is merely an anti-alienation provision against the per capita share held by the Tribe before it is disbursed as a per capita payment. Although the Tribe places restrictions on claims against the per capita *share*,[64] it is the per capita *payment* ultimately distributed to these Debtors that is at issue.

Again, none of this word smithing does anything to satisfy the criteria for

---

[61] *In re McDonald*, 353 B.R. at 293.

[62] Exhibit A p.4-42 (Section (D)(6)). The term per capita share is defined as "a Tribal member's equal share of a Per Capita payment prior to a reduction for any withholding, garnishment, or levy permitted by this Section, but after withholding at the source required by federal income tax law," *id.,* and is "property of the [Tribe] until such time as a distribution is made," Exhibit A p.4-43 (Section (E)(3)).

[63] Exhibit A p.4-43 (Section (E)). The per capita payment is "a periodic payment," Exhibit A p.4-43 (Section (E)(2)), and "distribution . . . occurs when the Per Capita payments are placed in the U.S. Mail or otherwise transferred to a Tribal member," Exhibit A p.4-43 (Section (F)).

[64] *See* Exhibit A p.4-43 (Section (G)(1)) ("A Per Capita Share shall not be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, seizure, attachment or other legal or equitable process."); Exhibit A p.4-44 (Section (H)) ("[A] Per Capita Share shall not be subject to anticipation, alienation, sale, transfer, assignment[,] pledge, encumbrance or charge, seizure, attachment or other legal or equitable process; and any proceeding for those purposes shall not be recognized nor enforceable.").

excluding the per capita as a spendthrift trust under § 541(c)(2).[65] The Tribal Code simply fails to create a trust for payments made to anyone except minors and incompetent adults, which is the basic requirement for § 541(c)(2) to apply to Debtors' per capita payments here.

The post-*In re McDonald* changes to the Tribal Code simply do not alter this Court's analysis. They do not affect the right of any eligible member to receive a per capita payment. Neither the Per Capita Ordinance, nor the Tribal Code, restrict or prohibit the distribution of a per capita payment to a competent, adult Tribal member. No trust is created by the per capita distributions that, per Tribal Code and Ordinance, are to be made to all members, regardless of need or individual circumstances. And the anti-alienation provision of the per capita share has no impact on this analysis: as stated in *McDonald*, "[p]roperty is not subject to a trust simply because a governmental entity has declared that property exempt from execution to satisfy a judgment."[66]

---

[65] As the Trustee notes, the Tribal Code suffers inconsistencies. On one hand, it attempts to claim the per capita share as Tribal property until payment is made. But on the other hand, the definition of per capita share requires that the amount of the share be reduced by federal income taxes. But how can federal income tax be owed by the tribal member unless and until the per capita—whether defined as a "share" or "payment"—is property of the Tribal member? Because the Trustee points out this inconsistency, the McDonald Debtors argue that this Court should "ask the Tribal Council for clarification before proceeding to decide these issues." Case No. 14-40529, Doc. 45 at p.1. Although the Court notes the inconsistency, it has no bearing on the holdings herein, is thus irrelevant, and referral to the Tribe is unwarranted.

[66] *Id.* at 294. Debtors attempt a round-a-bout sovereign immunity argument here by arguing that the Prairie Band Tribe, as a sovereign, has the right to determine what are property rights under its jurisdiction, relying on an Eighth Circuit BAP case that holds that a tribe and its tribal finance company could assert the tribe's sovereign immunity as a defense to a chapter 7 trustee's avoidance and turnover action. *Bucher v. Dakota Fin. Corp. (In re Whitaker)*, 474 B.R. 687 (8th Cir. BAP 2012); *see also Ho-Cak Fed. v. Herrell (In re DeCora)*, 396 B.R. 222 (W.D. Wis. 2008) (concluding chapter 7 trustee could not exercise

-18-

The individual Debtors make a couple of additional arguments. The Scott Debtors refer to per capita funds held in trust by the Secretary of the Interior under 25 U.S.C. § 117a, which governs "[f]unds held in trust by the Secretary of the Interior . . . for an Indian tribe," and argue that "by analogy, the per capita from Indian gaming, under the Tribe's current per capita ordinance and its code of procedure on per capita payments, create a trust similar to that described in 25 U.S.C. § 117a."[67] But of course, this is not the reality. The reality is that the Prairie Band has not elected to create a trust with respect to per capita payments. The Per Capita Ordinance directs that "every eligible Potawatomi tribal member" receive an "equal share" of the Tribe's net gaming revenues,[68] and these payments are made regardless of need.

The McDonald Debtors then argue that their current financial situation dictates a different result from their prior case because now Debtor Bonnie McDonald receives Social Security disability income. Debtors argue that because she is disabled, her per capita payment should be viewed as a public assistance benefit, and the Court should thus infer the creation of a spendthrift trust as to her. But as discussed at length, the per capita payments simply do not work that way. Just because Bonnie McDonald

_____

avoidance powers against bank because "tribal law subordinates the lien creditor's claim to [the tribe's] and federal preemption and tribal sovereignty prevent state law form altering this result"). But the Trustee is not attacking the Tribe's sovereign immunity here; the Tribe is not a party, and what constitutes a spendthrift trust is determined by trust law, not the Tribe's exemption ordinance.

[67] Case No. 14-40543, Doc. 43 at pp.6–7.

[68] Exhibit B p.5 (Article V, Section 1). The Per Capita Ordinance also states: "Every living person who is an enrolled member of the Prairie Band of Potawatomi Indians on the eligibility determination date is eligible to receive a Per Capita Payment." Exhibit B p.4 (Article IV, Section 1).

happens to be disabled, does not mean that the Prairie Band Tribe has in the past or is presently treating her any differently than any other legally competent adult. There is simply no evidence in the record that Bonnie McDonald has been adjudged incompetent by a court of competent jurisdiction, or that she has a legal guardian appointed to receive her per capita payments, or that her payments are received from an independent trustee after meeting the stringent provisions in Section 4 of Article V of the Per Capita Ordinance. Her disability for Social Security purposes is simply irrelevant to the provisions of the Tribal Code and Per Capita Ordinance.

And finally, Debtors point to other courts outside of Kansas addressing tribal per capita payments that have concluded that per capita payments are <u>not</u> property of the estate. For example, in *Dietz v. Barth (In re Barth)*,[69] the bankruptcy court concluded that tribal per capita payments were <u>not</u> property of the bankruptcy estate where the tribal ordinance at issue stated that the per capita payments were not a property right but a personal benefit, did not vest until actually paid out, and were not subject to alienation.[70] The bankruptcy court concluded that the tribe had "the authority to limit the definition of property right with respect to tribal property to exclude the per capita payments of tribal funds paid by the tribe to qualified members," and that there was "no credible reason" why the tribe could not define property rights with respect to property within its jurisdiction and exclude them from property of the estate.[71]

---

[69] 485 B.R. 919 (Bankr. D. Minn. 2013).

[70] *Id.* at 921–22.

[71] *Id.* at 922.

But *In re Barth* did not address any of the above case law or assess the Bankruptcy Code in any way. Instead, its rationale centered around the existence of prior harms by the United States to Native Americans.[72] And while those harms cannot be denied, Congress has not seen fit to directly address those harms within its liberal treatment of what constitutes "property" under the Bankruptcy Code.

As a result, this Court concludes that the Bankruptcy Code defines "property of the estate" via § 541(a), and the scope of that definition is broad and equally applicable to the per capita payments these Debtors receive.[73] The controlling law in the Tenth Circuit requires this Court to determine the existence and scope of Debtors' interest in property by reference to the underlying property law, and contingent interests fall within the bankruptcy estate.[74] Nothing in the changes to the Prairie Band's legal

---

[72] *See id.* at 922 n.2 (referring to "lessons learned from earlier tribal experience"). An additional case concluding that a similar tribal code's treatment of per capita payments caused the payments to <u>not</u> be property of the estate is *In re Fess*, 408 B.R. 793, 799 (Bankr. W.D. Wis. 2009), which concluded that federal law and tribal law, not state law, defined the property interest, and that under the tribal law the debtors had only "an expectancy to which no legal rights attach." *See id.* at 798 (applying tribal law instead of state law because the tribe's interest in controlling its revenue outweighed the state's interest in the same).

[73] *See Weinman v. Graves (In re Graves)*, 609 F.3d 1153, 1156 (10th Cir. 2010) (stating that § 541(a) "is deliberately broad in scope").

[74] *See, e.g.*, *Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1204–05 (10th Cir. 2010) (stating that "property interests are created and defined by state law" and that federal law resolves the question of "the extent to which that interest is property of the estate;" holding that under Kansas law, "contingent interests are property interests"); *see also Case v. Hilgers (In re Hilgers)*, 371 B.R. 465, 468 (10th Cir. BAP 2007) (noting that the nature of a property interest must be analyzed under applicable state law); *In re Howley*, 446 B.R. 506, 510–11 (Bankr. D. Kan. 2011) ("Kansas law recognizes contingent interests as property. The Court has no doubt that the Kansas courts would recognize Debtor's interest in future Per Capita Payments as a property interest. The question is then whether that interest is property of the estate, as defined by federal law. Section 541(a) defines property

-21-

definitions concerning per capita alter this result.

## 2. Best Interest of the Creditors Test of § 1325(a)(4)

Regarding the best interest of the creditors test under § 1325(a)(4), this Court in

*In re Hutchinson* stated:

> The test, articulated under § 1325(a)(4), requires that the Chapter 13 plan provide distributions to each allowed unsecured creditor that are not less than what the unsecured creditor would have received if the debtor's estate were liquidated under a Chapter 7 proceeding. This provision essentially allows Chapter 13 debtors to "buy-out" non-exempt, prepetition assets by paying their value to unsecured creditors with increased payments (or payments over a longer term) to the Trustee over the life of the plan.
> . . .
>
> [I]n order to comply with this test, Debtors' plan must propose to pay their unsecured creditors an amount at least equal to what those creditors would have received had the bankruptcy estate been liquidated under a Chapter 7 proceeding. According to the parties' stipulations, the amended plan "does not propose to pay any money to unsecured creditors." Therefore, the plan can only be confirmed if Debtors can show that a liquidation of the estate would have resulted in no payments to unsecured creditors.
>
> If the bankruptcy estate were liquidated, the trustee would collect and sell all non-exempt, unencumbered property of the estate of consequential value and divide the proceeds from the sale among the unsecured creditors.[75]

Debtors have the burden of proving that they have "met all of the requirements of §

-----

of the estate as including all legal and equitable interests of the debtor in property as of the commencement of the case. [T]he scope of § 541 is broad and should be generously construed. [A]n interest may be property of the estate even if it is novel or contingent. Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of 11 U.S.C. § 541." (internal footnotes and quotation marks omitted)).

    [75] *In re Hutchinson*, 354 B.R. at 531.

1325, including the 'best interest of the creditors' test under § 1325(a)(4)."[76]

Again, Debtors argue that the changes to the Tribal Code and Per Capita Ordinance require a different result than the Court's prior determination concerning their per capita payments and the best interest of the creditors test. Debtors argue that because of the anti-alienation provision as to the per capita share, and the Tribal Code's labeling of the per capita *payment* as "a personal benefit" and "a periodic payment not a property right," while the per capita *share* is labeled "property of the [Tribe] until such time as a distribution is duly made," that their per capita cannot be alienated and would thus have no value in a chapter 7 proceeding that could be realized to pay claims of unsecured creditors.

The Court disagrees with Debtors' conclusion. The Tribal Code asserts anti-alienation provisions as to the per capita shares while they are held by the Tribe prior to disbursement to the Tribal member. Once the Tribe makes the decision to make a disbursement, however, the per capita payment is automatically distributed to all Tribal members on a per capita basis. As such, these Debtors continue to have an expectation of payment, unchanged by the modifications to the Tribal Code. Once that payment is received, it is transferable by Debtors. The interest is admittedly a contingent interest, but as an interest that is property of the estate, it must be accounted for in the best interest of the creditors test.

This Court has previously rejected the argument that the per capita payments cannot be valued because of their uncertain nature. In *In re Hutchinson*, this Court

---

[76] *Id.*

concluded that the fact that "the present value of the per capita distributions might be difficult to ascertain does not mean that those distributions have no value."[77] Because the per capita payments are capable of being valued, the payments "must be provided for in [the debtors'] Chapter 13 plan in the form of payments to the unsecured creditors to satisfy the 'best interest of the creditors test.'"[78]

Debtors also again contend they should not have to account for the per capita payments in the best interest of the creditors test of § 1325(a)(4), because they are already accounting for them in their disposable income and satisfying the best efforts test of § 1325(b)(1)(B). As stated previously in *In re Hutchinson*, however, the best interest of the creditors test of § 1325(a)(4) is a separate and distinct test from the best effort requirement of § 1325(b)(1). Because of this, the fact that Debtors are proposing to commit all of their disposable income to plan payments during the life of their chapter 13 plan has no bearing on the § 1325(a)(4) analysis.[79] If the result of subtracting their living expenses from their income demonstrates an inability to repay the value of this contingent interest, that unfortunately means that their plan is not feasible, not that they do not have to account for that interest in the first instance.

And finally, Debtors point to a line of cases that conclude per capita payments are property of a bankruptcy estate, but that then conclude that in the chapter 7 setting, the per capita payments are of inconsequential value to the estate for purposes of analyzing

---

[77] *Id.* at 532.

[78] *Id.*

[79] *Id.* at 531.

turnover to the chapter 7 trustee. In *In re Meier*,[80] the bankruptcy court first presumed— without deciding— that tribal per capita payments were property of the estate.[81] The *In re Meier* decision then held that the per capita payments were nevertheless not subject to turnover because § 542(a) sanctions non-turnover, even of estate property, if "such property is of inconsequential value or benefit to the estate."[82]

The *Meier* court followed a Ninth Circuit BAP case holding that an interest in a future distribution "'is only of value to the estate if it can be assigned, sold or reached for the enforcement of judgments,'"[83] and concluded that the per capita payments the debtor expected to receive were nontransferable based on "the tribe's clear intent to preclude sale or transfer of the right to receive payments to anyone outside of the tribe."[84] Because of this finding, the *In re Meier* court concluded the per capita payments

---

[80]  Case No. 13-02323-B-SWH, 2013 WL 6135085 (Bankr. E.D.N.C. Nov. 21, 2013).

[81]  *Id.* at *2.

[82]  *Id.* at *3.

[83]  *Id.* (quoting *Brown v. Locke (In re Locke)*, Case No. NC-06-1101, 2006 WL 6810938 (9th Cir. BAP Sept. 28, 2006)).
The *In re Locke* case, relied on by *In re Meier*, affirmatively concluded that the tribal per capita payments at issue in the chapter 7 case were property of the estate. 2006 WL 6810938, at *9–11 (holding that the per capita payments actually received prepetition were personal property and that the entitlement to future payments was a contingent, intangible property interest; concluding both were property of the estate). The *In re Locke* case then considered whether, because the per capita shares did not become the debtor's personal property until each payment was made, the contingent interests in future payments were protected against transfer. *Id.* at *14–15. The Ninth Circuit BAP concluded that a remand was appropriate for the bankruptcy court to consider whether the trustee's motion for turnover was appropriate, because the "interest in future distributions is only of value to the estate if it can be assigned, sold or reached for the enforcement of judgments," and for a determination of the asset's value to the estate. *Id.* at *12, *15–16.

[84]  *Id.* at *4.

-25-

were of negligible value to the estate.[85] In addition, that court concluded that because the per capita payments would be hard to market due to the variability of the payments and the fact that the payments would cease immediately upon the death of a member, and the fact that the bankruptcy case would have to be held open for a lengthy time for the trustee to administer the payments, the chapter 7 trustee's efforts would actually be a burden to the estate, rather than a benefit.[86]

This line of cases, however, again does not help the Debtors here. These cases do not change this Court's analysis that the per capita payments are in fact property of the estate. And as property of the estate, they must be accounted for in the best interest of the creditors analysis. Obviously, the parties in interest will need to negotiate the correct value of these admittedly contingent interests, and litigate that value if no agreement can be reached. But no party has yet raised the valuation issue with any specificity, and there is nothing in the record that would allow this Court to find that these property interests have no value. That is an issue for another day if the parties are unable to agree on the value.

### 3.    Exemption Arguments

Finally, the McDonalds argue that if the per capita payments are property of the estate, then under § 522(b)(3)(A) they are exempt as a "local law . . . that is applicable . . . to the place in which the debtor's domicile has been located for the 730 days

---

[85] *Id.*

[86] *Id.* at *5.

immediately preceding the date of filing of the petition. . ."[87] Counsel's convoluted argument in this respect appears to be that because the Tribal Code extends its jurisdiction to "all Tribal Members, wherever located,"[88] the Tribe therefore "retains authority and jurisdiction over per capita payments and to its recipients living off the reservation."[89] As a result, counsel argues that the Bankruptcy Code's exemption for local laws applicable to the place of a debtor's domicile somehow requires that the Tribal Code's anti-alienation provisions for the per capita share exempt the McDonalds' per capita payments from the bankruptcy estate.[90]

The McDonald's exemption argument is unpersuasive. First, as Judge Somers held in *In re Howley*, even if the Tribal Code could be considered a "local law" under the Bankruptcy Code, the Bankruptcy Code additionally requires the "use of state or local law *applicable at the place in which the debtor's domicile has been located for a specific period*."[91] Because the *Howley* debtor was not domiciled on the Tribe's reservation, the

---

[87] 11 U.S.C. § 522(b)(3)(A).

[88] Exhibit A p.4-41 (Section B).

[89] Case No. 14-40529, Doc. 42 at p.3.

[90] The McDonald Debtors do not appear to be making a sovereign immunity argument here, although they do claim in their reply brief that allowing the Trustee to "take" Debtors' per capita payments "would be to continence a violation" of federal and state treaties with the Tribe. They also argue that the Tribal Code is entitled to respect as the Tribe is a sovereign entity. Case No. 14-40529, Doc. 41 at p.4. There is no violation of sovereign immunity here, however, because no claim is being made against the Tribe and sovereign immunity does not extend to Tribe members not representing the Tribe. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1153–54 (10th Cir. 2011) (describing sovereign immunity of Indian tribes and stating that the immunity extends to tribal officials, "so long as they are acting within the scope of their official capacities").

[91] *In re Howley*, 439 B.R. at 541–42 (emphasis added).

-27-

Tribe's exemption did not apply.[92]

Second, domicile is a defined term. "Generally, the words and phrases contained in a federal statute are defined by reference to federal law."[93] When the Supreme Court defined the term "domicile" in reference to the Indian Child Welfare Act, it concluded that domicile is "established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there."[94] A person can have only one domicile at a time, even if that person has multiple residences.[95]

The McDonalds specifically stipulated that they lived in Topeka on the date they filed their bankruptcy petition, and that they have lived in Topeka at the same address for the 730 days prior to filing their petition. In other words, Debtors stipulated that they were not at filing, and had not been for the last 730 days, living on Tribal land. If that were not already crystal clear, Debtors additionally stipulated that their Topeka residence is not located on the Tribe's reservation. As a result, the McDonalds are not domiciled on Prairie Band land but instead in Topeka, Kansas. The state or local law applicable at the place of Debtor's domicile is the law of Kansas.[96]

----

[92] *Id.* at 542.

[93] *In re Hodgson*, 167 B.R. 945, 949 (D. Kan. 1994) (citing *Jerome v. United States*, 318 U.S. 101, 104 (1943)).

[94] *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

[95] *In re Hodgson*, 167 B.R. at 950 (citing *Williamson v. Osenton*, 232 U.S. 619 (1914)).

[96] Regardless of all this, the McDonalds never do attempt to explain how the Tribal Code's anti-alienation provisions as to the per capita share somehow transform into a Bankruptcy Code exemption of Debtors' per capita payment. Regardless, the McDonalds' "local law" exemption argument fails for so many other reasons, the Court need not address

-28-

The McDonalds additionally argue that because Bonnie has a joint tenancy interest in approximately 86 acres of Tribal trust agricultural land managed by the Secretary of the Interior (pursuant to 25 U.S.C. § 3701–3715)—land upon which she does not reside—that she should nevertheless be treated as being domiciled on the Prairie Band land or that the Tribe somehow has jurisdiction over the funds in her hands. As stated above, however, owning land, in trust or otherwise, does not equate to a domicile. None of the stipulated facts even suggest that the McDonalds live or have ever lived on Prairie Band land; the only facts before this Court are that they lived in Topeka at filing and have lived at the same address therein for the 730 days prior to filing. In addition, the Tribal Code itself states that once a per capita payment is made to a Tribal member, it is a personal benefit to that member and is no longer property of the Tribe. Accordingly, the fact that Debtor Bonnie McDonald holds an unrelated joint tenancy interest in Prairie Band land held in trust is simply irrelevant to the analysis under § 522(b)(3)(A).

And finally, although again not clear, the McDonalds may be arguing that because Debtor Bonnie McDonald receives Social Security disability payments, her per capita payments are somehow transformed into, and exempt as, "a local public assistance benefit" under § 522(d)(10)(A). Citing *In re Hutchinson*,[97] which defined "public assistance benefit" as "government aid to needy, blind, aged, or disabled persons

this lapse.

[97] 354 B.R. 523 (Bankr. D. Kan. 2006).

Case 14-40529    Doc# 48    Filed 10/27/14    Page 29 of 30

and to dependent children,"[98] the McDonald Debtors argue that "[n]one can deny that Bonnie McDonald is disabled and that what she receives constitutes a *de facto* public assistance benefit from her tribe."[99] But again, as stated repeatedly herein and as this Court noted in *In re Hutchinson*, because the Tribe's per capita payments are not based on need, but are distributed simply on a per capita basis, they are not an exempt public assistance benefit.[100] Although Debtor Bonnie McDonald receives Social Security disability income, her per capita payments are distributed to her by the Tribe without regard to any disability.

## III. Conclusion

The Trustee's objections to confirmation and objections to exemption are sustained, for the reasons stated more fully above. Debtors shall file amended plans that comply with this opinion within 21 days. If Debtors choose not to amend their plans within this time frame, the Trustee should submit orders granting his motions to dismiss each case.

**It is so ordered.**

# # #

---

[98] *Id.* at 530.

[99] Case No. 14-40529, Doc. 42 at p.5.

[100] *In re Hutchinson*, 354 B.R. at 530–31.

-30-